IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 1:06cr269-MHT |
| | ) | (WO) |
| BRIAN STANYARD | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Defendant Stanyard filed a motion to suppress evidence in this case (Doc. # 21), and the government has responded (Doc. # 29). The court held a hearing on the motion on April 12, 2007. For the reasons set out below, the motion is due to be denied.

**Facts**

On November 2, 2006, officer Joe Cochran, a vice investigator with the Dothan Police Department, was riding on routine patrol with Corporal Andy Martin on South Oates Street in Dothan around 8 p.m. when he noticed a white male driving a gold Blazer. Cochran recognized the driver and the vehicle because he had been called in mid-October to investigate an incident in which the same man, Harmon Cook, was arrested for possession of crack cocaine. Martin had also previously arrested Cook for possession of crack cocaine.

Cochran and Martin decided to follow Cook to see where he was going. They knew that he lived in Florida (he had a Florida tag) and believed that "usually the only time he'd come to Dothan was to make a purchase for crack cocaine." The officers thought it likely that Cook was trying to buy drugs. They got behind his vehicle, staying back a bit, to see where it was going.

The Blazer "went down a known drug area on Chickasaw Street and Blackshear, come through, and went back south on South Oates." The officers did not know whether Cook made a purchase in that area or "was still looking to buy." Cochran and Martin followed Cook's vehicle to the entrance of the Fieldcrest Apartments. Martin had, on a previous date, received an anonymous call indicating that someone had been selling crack cocaine at the entrance to the Fieldcrest Apartments. The description of the person selling drugs was "a large heavyset black male," who was "Bev's son."

Cook pulled his vehicle into the entrance, about 50 or 60 yards from the roadway, and stopped in the middle of the road. As the officers pulled in behind the Blazer, they observed a heavyset black male walk to the car, lean in toward the passenger side, and start talking with the driver.[1] Cochran and Martin recognized the individual as defendant Brian Stanyard from previous calls to the 500 block of Shirley Street, an area frequented by Stanyard. Cochran also knew that Stanyard's mother, who lives in the 500 block of Shirley Street, is named Bev.

As the officers were in the process of pulling up and getting out of the car, and while Stanyard was walking to the Blazer, Cochran and Martin saw what they believed to be a hand-rolled marijuana blunt behind Stanyard's left ear. After they observed the blunt, Cochran took it from behind Stanyard's ear and placed Stanyard in handcuffs. Cochran checked the blunt by smelling it. He testified that it "smelled of unburnt marijuana"– which

---

[1] The time was around 8:30 p.m., and it was dark outside. However, the officers had their headlights on, pointing straight toward the Blazer, and the area was well-lit.

it proved to be after later testing. Cochran smelled the blunt only after handcuffing Stanyard, because he "couldn't hold the blunt at the same time [he] was putting handcuffs on him."

The officers asked Stanyard what he was doing out there, and Stanyard said that he was visiting an aunt who lived in a nearby apartment. Stanyard said that he had left his car at the apartment (on the opposite side) and the white male had brought him back over to the entrance. However, Stanyard could not say what apartment number his aunt lived in, and the officers knew that no-one else had been in Cook's car when they followed it. They found Stanyard's car and, after Stanyard's arrest and after a drug dog alerted on the driver's side door, they searched the car but found no illegal drugs. The courtesy officer for the apartments then checked and found that Stanyard was on the lease at apartment 107. A woman at that apartment gave consent for the officers to search the residence. Police found 9-10 bags of crack cocaine (199.4 grams) in a glass dome under the ceiling fan in the master bedroom of the apartment, and a Norinco SKS assault rifle on the top right side of closet.[2]

## Discussion

Terry stop

Defendant contends that the officers' decision to stop him and seize the blunt was not justified under Terry v. Ohio, 392 U.S. 1 (1968). Pursuant to Terry, "[l]aw enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to

---

[2] Defendant asks the court to suppress these items as the "fruit of the poisonous tree" – that is, the allegedly illegal arrest and seizure of the marijuana blunt.

engage, in criminal activity." United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993) (citing Terry v. Ohio, 392 U.S. 1 (1968)); see also United States v. Dunn, 345 F.3d 1285, 1289 (11th Cir. 2003) ("[M]inimally intrusive searches and seizures of the person are permissible when a law enforcement officer has an objectively reasonable suspicion that 'criminal activity may be afoot.'").

"[T]he standard that must be satisfied to justify a Terry stop or search is significantly less onerous than is a showing of probable cause to arrest." Id. An officer making a Terry stop must be able to articulate something more than an inchoate and unparticularized suspicion or hunch; the Fourth Amendment requires some minimal level of objective justification for making the stop. Id.; see also United States v. Hensley, 469 U.S. 221, 229 ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion."). The reasonable suspicion required for a Terry stop is "taken from the totality of the circumstances." Diaz-Lizaraza, 981 F.2d at 1220-21 (citation omitted).

In this case, Cochran and Martin had sufficient reasonable suspicion to stop defendant Stanyard and to seize the marijuana blunt in question under the totality of the circumstances. Those circumstances included the fact that: (1) the officers knew Cook to be a purchaser of illegal drugs, and believed that he usually came to Alabama from Florida looking for crack cocaine, (2) the officers knew that Stanyard was often found in an area known for drug

sales,[3] (3) Cochran had previously received an anonymous tip about drug sales at the entrance to the Fieldcrest Apartments, (4) Stanyard, who is a "large heavyset black male" and whose mother's name is Bev, fit the description of the drug dealer mentioned by the tipster, and (5) Stanyard approached Cook's car at the entrance to the Fieldcrest Apartments, which was reported by the tipster as the location of the sale of crack cocaine that was the subject of the tip.[4]

Further, Cochran and Martin observed what they believed to be a marijuana blunt behind Stanyard's ear. The officers described the blunt as 4 or 5 inch long hand-rolled, brown cigar that looked rough from the outside. It was not as smooth and round as a regular cigar, and it was "a whole lot thinner," "close to about the size of a pen or a pencil." The ends of the blunt were "tapered down and twisted." Martin has 16 years' experience with the Dothan Police Department, where he worked patrol for 12 ½ years, and then worked drug

---

[3] The officers knew Stanyard from calls to the 500 block of Shirley Street, where his mother resides and he would often "hang out." Cochran described this area as "a very bad drug area," which had generated a high volume of dispatch calls for criminal activity such as shots fired and drug sales (there were some 60 calls to the area in a six-month period, from July to December 2006). Cf. United States v. Gordon, 231 F.3d 750, 755 -756 (11th Cir. 2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a Terry analysis."). In this case, although the stop did not occur in a high crime area, the officers reasonably associated Stanyard with such an area because of their prior contacts with him on Shirley Street.

[4] Anonymous tips corroborated by independent police work – that is, in this case, the observations made at the scene by the officers, and their prior knowledge of Cook and Stanyard – can be reliable enough to provide reasonable suspicion to make investigatory Terry stops. United States v. Gibson, 64 F.3d 617, 620 (11th Cir. 1995); see also United States v. Roper, 702 F.2d 984, 989 (11th Cir. 1983).

cases only for the last 3 ½ years. Cochran worked patrol for some six years with various police departments, followed by seven months as a vice (drug) investigator. Martin testified that he has seen 100-200 blunts before, and Cochran said that he had seen a marijuana blunt 10-20 times before "rolled up that way." Both officers testified that they had never seen a hand-rolled cigar of that kind before that contained tobacco, and that they had never seen such a hand-rolled cigar that did not contain marijuana. The court credits the officers' testimony that they were able to recognize a marijuana blunt. "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Gordon, 231 F.3d at 756.

Thus, under these circumstances, the officers were justified in concluding that there was a fair probability that illegal activity had occurred, and they had sufficient reasonable suspicion to stop Stanyard and seize the blunt.[5]

### Conclusion

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that the motion to suppress be DENIED.

---

[5] Because the court concludes that Terry permitted the stop and seizure in this case, it does not reach the question of whether the plain view exception also applies. However, it appears to the court that the plain view doctrine would also permit the seizure in question. "The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006). Here, there was a practical, non-technical probability that the hand-rolled cigar in plain view behind Stanyard's ear was a marijuana blunt. Under such circumstances, the plain view exception is satisfied. See United States v. Smith, 459 F.3d 1276, *1291 (11th Cir. 2006); United States v. Gordon, 2007 WL 710094, *4 (M.D.Ala.2007); United States v. Castle , 2006 WL 1669874, *9 -11 (W.D.Ky. 2006).

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before May 18, 2007. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 8th day of May, 2007.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE